[No. 67-2.    Division Two.    December 21, 1970.]

Concrete Technology Corporation *et al., Appellants,* v. Laborers' International Union of North America, Local No. 252, *Respondent.*

*Gordon, Honeywell, Malanca, Peterson & Johnson, Charles R. Johnson,* and *Joe Gordon, Jr.,* for appellants.

*Bassett, Donaldson & Hafer, Hugh Hafer,* and *Lawrence Schwerin,* for respondent.

Petrie, J.—In December, 1966, plaintiff employers and defendant labor organization entered collective bargaining negotiations designed to develop a new collective bargaining contract to replace an existing contract which was

about to expire. The employers were represented by Mr. Pat Blair of Cascade Employers Association, Inc., and the union was represented by Mr. William Reynolds, business agent for Local 252, Laborers' International Union of North America, AFL-CIO.

By March, 1967, all issues, except the matter of vacations, had been resolved. Thereafter, although negotiations never completely stalemated, they reached the point of near collapse by May, 1967, and strike action appeared imminent. On May 12, Mr. Blair sent a night letter to Mr. Reynolds setting forth what purported to be the employers' full and final offer covering the only unreconciled area of dispute. For purposes of this appeal, the pertinent portion of the telegram recited:

> VACATION SCHEDULE TO BE 1 WEEK AFTER ONE YEAR AND TWO WEEKS AFTER 5 YEARS AS OF FEBRUARY 1, 1967. ON FEBRUARY 1, 1968 THE SCHEDULE TO BE 1 WEEK AFTER ONE YEAR AND TWO WEEKS AFTER THREE YEARS. ON FEBRUARY 1, 1969, THE VACATION SCHEDULE TO BE 1 WEEK AFTER ONE YEAR, 2 WEEKS AFTER THREE YEARS AND 3 WEEKS AFTER SIX YEARS, WITH EMPLOYEES OPTION TO TAKE 3 CENTS PER HOUR IN WAGES IN 1969 IN LIEU OF THE 3RD WEEK OF VACATION.

On May 15, 1967, Mr. Reynolds responded by letter to Mr. Blair, indicating that, at a meeting held on May 13, 1967, the union membership had voted to accept the employers' vacation offer, together with the other previously negotiated changes from the old contract. The letter was sufficiently detailed to make it plain that it was intended to cover all the points under negotiation. By letter dated May 17, addressed to Mr. Reynolds, Mr. Blair acknowledged receipt of the union's acceptance of the employers' proposal, and further advised that he would forward "contracts for signature by the first of the week".

Within a few days, Mr. Blair did prepare the document for signature and did forward copies thereof to Mr. Reynolds. However, the document mistakenly failed to indicate that the third week of vacation, available after 6 years employment, was to become effective in 1969. Mr. Rey-

nolds, after reviewing the document, became aware of the mistake. Nevertheless, with full knowledge that omission of the effective date was a typographical error, he submitted the document to union membership. It was approved as written, and subsequently executed by the authorized union representatives.

Several weeks later, when Mr. Blair realized the error, he forwarded a corrective schedule to Mr. Reynolds, hoping that it would be made a part of the contract by addendum. Mr. Reynolds replied that the union would stand by the terms of the contract as executed by the parties. The matter remained unresolved until several employees, in November, 1967, asserted a demand for the 3 cents per hour in lieu of the third week of vacation. Thereupon, the employers' brought this action seeking, pursuant to the contract, to compel the union to arbitrate specific terms of the contract related to vacations. The complaint was subsequently amended to seek, additionally, reformation of the contract to conform to the prior exchange of correspondence between the parties.

After trial on the merits, the court found, *inter alia*:

5.

On May 15, 1967, Mr. Reynolds wrote to Mr. Blair a letter accepting the final offer and spelling out in detail the deferred dates for vacation benefits as offered in the telegram on May 24 [12], 1967. The only variation in the terms of the offer and acceptance was a misplaced period which was clearly a typing error. The said letter was sufficiently detailed to make it plain that it was intended to cover all the points under negotiation, and written with reference to the existing contract which was about to expire.

6.

That just prior to May 29, 1967, Mr. Pat Blair forwarded a formal document incorporating the prior agreement of the parties but omitting through inadvertence the effective dates for increased vacation benefits. *It was inherent in the mechanics of its formation that the membership would have to give assent to the document before there was an effective contract.* This they did, but it was

to a document containing a mistake which was known to their negotiating agent but apparently concealed from them. That on said May 29, 1967, Mr. Reynolds submitted the document to the union membership, with the full knowledge that the omission of the effective dates of said benefits was a typographical error. He did not disclose the said discrepancy to his membership.

(Italics ours.)

Based upon the factual findings made, the court concluded, *inter alia*:

### 2.

That there was a complete meeting of the minds on receipt of the communication of May 15, 1967.

### 3.

That the omission of the effective dates for vacation benefits in the formal document approved May 29, 1967, by the union membership was inadvertent. That the agent for the defendant acted inequitably with full knowledge of the mistake and with bad faith towards his adversary and his own membership.

### 4.

*That because of the peculiar manner in which the contract was to be formed, the remedy is that of rescission rather than reformation.*

(Italics ours.)

The court thereupon entered judgment denying the employers' petition for reformation of the contract, and ordering instead, rescission of the collective bargaining contract between the parties. The employers have appealed, assigning error to the italicized portion of finding of fact No. 6, to all of conclusion of law No. 4 and to the judgment entered.

Prior to examining the merits of the appeal, we must consider the union's contention that the issues before this court are now moot and this appeal should, therefore, be dismissed. The union's position is based upon the 3-fold assertion that (1) the contract, even if it should be reformed and not rescinded, would have expired, by its terms, on February 1, 1970; (2) all disputed terms of the contract have been enforced in precisely the manner in

which the employers have sought reform; and (3) no decision of this court could affect future action of the parties or subject either party to damages. We would be inclined to accept the union's contention—indeed the employers concede the merits thereof—except for the possible effect of one intervening fact. Subsequent to issuance of the trial court's memorandum opinion, but prior to entry of judgment, employees of one of the employers herein engaged in a brief strike apparently between April 28, 1969 and May 6, 1969.

In passing upon the issue of mootness, we note preliminarily, that in a matter of this nature the issue of mootness itself is a matter to be determined under the provisions of federal law. *Liner v. Jafco, Inc.*, 375 U.S. 301, 11 L. Ed. 2d 347, 84 S. Ct. 391 (1964). The test appears to be whether or not a decision on the merits can affect the rights of the litigants. *St. Pierre v. United States*, 319 U.S. 41, 87 L. Ed. 1199, 63 S. Ct. 910 (1943).

In the instant case, rescission of the contract would leave the parties in the position of having had no collective bargaining contract in force at the time of the April, 1969 strike. Under such circumstances, and so long as a labor dispute existed between the parties, an otherwise legally conducted strike would have constituted a legally permissible economic sanction available to the union under federal labor policy. Reformation, on the other hand, could conceivably leave the employer with a contractual remedy for violations thereof conducted by the union during the term of such contract. *Drake Bakeries, Inc. v. Local 50, Bakery Workers*, 370 U.S. 254, 8 L. Ed. 2d 474, 82 S. Ct. 1346 (1962); *Atkinson v. Sinclair Ref. Co.*, 370 U.S. 238, 8 L. Ed. 2d 462, 82 S. Ct. 1318 (1962). It follows that the conceivable contingent liability of the union, dependent as it is upon a decision on the merits of this appeal, adversely disposes the union's contention that this appeal should be dismissed. *Liner v. Jafco, Inc., supra.*

We turn now to the merits of the employers' appeal.

It is necessary, briefly, to focus upon the challenged portion of finding of fact No. 6, which declared that it was inherent in the mechanics of the formation of the contract that the union membership would have to give assent to the specific written, formal document before an effective contract could spring into existence. Such a finding appears to be a curious admixture of fact and law. To the extent that it is a finding of fact, we find it unsupported by evidence in the record.[1] Examining its validity as a conclusion of law forces us to determine what specific corpus of the law should be applied to the existing facts.

■ At trial, all parties appear to have concerned themselves only with principles of ordinary contract law. On appeal, for the first time, the union directs our attention to section 301(a) of the Labor-Management Relations Act of 1947 as follows:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce[2] as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

---

[1] The deposition of Mr. Lou Hashman, Business Manager of the Western Washington District Council of Laborers during the negotiation period, comes closest to any form of support, but it clearly refers to his knowledge of the situation which existed in March, 1967, prior to the critical stages of May, 1967. In March, Mr. Hashman declared, all negotiators thought "we had an agreement by all parties that [was] tentative, subject to going back to the employers on Pat Blair's case, and of course, subject to going back to our own people which is always customary." As events transpired, that tentative agreement collapsed completely. His negative response to the union's then counsel, as to whether or not there was ever an agreed contract other than the one signed by the local union, is itself his own self-supporting conclusion of law and not a factual assertion. There is nothing in Mr. Hashman's testimony to indicate that once the membership had ratified the agreement they reserved to themselves the right to ratify it once again after preparation of the formal document.

[2] The employers do not contend that they are not engaged in interstate commerce.

29 U.S.C. § 185(a) (Ch. 120, Title III, § 301, 61 Stat. 156 (1947)).

This statute does not divest state courts of jurisdiction over suits cognizable thereunder. *Humphrey v. Moore,* 375 U.S. 335, 11 L. Ed. 2d 370, 84 S. Ct. 363 (1964); *Local 174, Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 7 L. Ed. 2d 593, 82 S. Ct. 571 (1962); *Charles Dowd Box Co. v. Courtney,* 368 U.S. 502, 7 L. Ed. 2d 483, 82 S. Ct. 519 (1962).

In *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 1 L. Ed. 2d 972, 77 S. Ct. 912 (1957), the Supreme Court declared that section 301(a) was not merely jurisdictional, but actually created a new corpus of federal labor law, whose substantive principles, to be fashioned from the policy of our national labor laws, are paramount in the area covered by the statute. To the extent that state law is not inconsistent with federal labor law, it may be applied by the process of being absorbed into the corpus of federal labor law. To the extent that local law is inconsistent with federal labor law, it will be rejected. *Local 174, Teamsters v. Lucas Four Co., supra.*

Some lingering doubt may exist as to the applicability of section 301(a) to a suit raising the issue of the *formation* of a collective bargaining contract, as opposed to the *interpretation* thereof. *See Genesco, Inc. v. Joint Council 13, United Shoe Workers,* 341 F.2d 482 (2d Cir. 1965). Although granting token relevancy to section 301(a), the court in *Genesco* did not apply national labor policy in adjudicating the question of formation of a collective bargaining contract, because the court could not find radiations from national labor laws providing clear signals as a guide to resolve the specific issue involved; namely, a determination of the exact point in time at which a bargain had been struck. The court's refusal to seek out appropriate principles of federal labor law has been severely criticized. *Note* section 301(a) and the *Federal Common Law of Labor Agreements,* 75 Yale L. J. 877 (1966); Summers, *Collective Agreements and the Law of Contracts,* 78 Yale L. J. 525, 537 (1969). We are inclined to the view that suits involving

contract formation are governed by section 301(a) of the Labor-Management Relations Act, at least where the complaint alleges the existence of a contract and seeks reformation thereof. Indeed, we are told on oral argument that the employers do not challenge applicability of federal law.

Our search narrows, therefore, to a search for requisite substantive provisions of federal labor law. Certainly there is nothing in specific congressional enactments which would require that union membership be obliged to give assent to the formal document before there could be an effective contract. Indeed, the statutory definition[3] of "collective bargaining" includes the concept of "the execution of a *written* contract incorporating any agreement reached *if requested by either party.*" (Italics ours.)

■ We turn, then, to the broader policy provisions of our national labor laws, and seek to assimilate such radiations as emanate therefrom. Certainly, two of the primary goals of our national labor policy are the promotion of collective bargaining and the preservation of labor peace. The developing rule of law appears to be that concepts of classical contract law—in the case at bar, rules of offer and acceptance—will be adhered to unless application of the classical concepts would thwart basic goals of our national labor policy.

In *United Steelworkers v. CCI Corp.*, 395 F.2d 529 (10th Cir. 1968) negotiations had broken down and a picket line had been established. Several days later, the parties met and completely settled their dispute. After the meeting at which accord had been reached, the union representative notified the company representative, "We have an agreement. The employees have accepted it. I am pulling the pickets." The employees did return to work, and the employer did prepare and send the formal document to the union for signature. The union failed to respond, and in the interim, the company was struck by a local of the teamster's union. All but seven of the steelworkers refused to cross the teamster picket line. The company brought a sec-

[3]29 U.S.C. § 158(d).

tion 301(a) action seeking damages for violation of the contract. The union defended on the ground that it was not bound by the oral agreement. The court recognized an obligation not to adhere to concepts which would frustrate the collective bargaining process, and declared at page 531:

But collective bargaining, while it has distinctive considerations, is premised upon good faith not only at the bargaining table but, in the full contemplation of the Act, in the commitments there made, relied on by the parties and acted upon by them. Thus, when bargaining is terminated and an agreement reached, the intent of the parties may be tested by the application of classic contract law, a principle recognized by the National Labor Relations Board in considering a § 8(a)5 violation for refusal to sign an agreed verbal contract. In the case at bar, the actions and statements of both parties point to the existence of a binding verbal contract.

Illustrative of occasions when broad contractual concepts remain appropriate, but technical applications will be rejected, is *Lozano Enterprises v. NLRB*, 327 F.2d 814 (9th Cir. 1964). In *Lozano*, the negotiators had reached accord, and the union representative, after obtaining membership acceptance, sent the final contract form to the company. The company president ultimately signed the contract, but instructed his negotiator not to deliver the document unless and until there was a real threat of a shutdown by the union. The company also contended that the final accord had been reached between the union negotiator and a company representative who had no authority to make a contract, a fact which the union negotiator knew at the time of making the accord. The court affirmed a NLRB determination that the employer had committed an unfair labor practice by refusing to "bargain collectively." In disposing of the employer's argument, the court declared at pages 818-19:

In our view, the employer's arguments may be accepted as stating good technical contract law, but we do not think that in this particular case they state good collective bargaining law. We do not think that, in deciding whether, under a particular set of circumstances, an

employer and a union have in fact arrived at an agreement that the employer is then obliged to embody in a written contract upon the union's request, the Board is strictly bound by the technical rules of contract law.

. . .

We do not at all mean to hold that, in general, the normal rules of offer and acceptance are not determinative as to whether an agreement has been reached in a collective bargaining situation. We do hold that where, as in this case, the terms proposed by the union are in fact acceptable to the employer, but delivery of the signed contract is withheld for the obvious tactical purposes that here appear, it is proper for the Board to conclude that there has been a failure or refusal to execute a written contract incorporating the agreement reached within the meaning of section 8(d). (29 U.S.C. § 158(d)).

. . .

To permit an employer to do what this employer did would encourage results directly contrary to the purposes of the collective bargaining provisions of the Act.

In the case at bar, of course, we are not dealing with an *oral* accord, but rather with a complete *written* acceptance following ratification by the union membership at its meeting of May 13, and embodied in Reynolds' letter of May 15, 1967. We conclude that the promotion of collective bargaining is best subserved by holding that there was a complete and binding contract—an effective acceptance of an offer —not simply a meeting of the minds, between the employers and the union upon the employers' receipt of the union communication of May 15, 1967; and it was not inherent in the mechanics of its formation that the formal written document had to be executed before there would be an effective contract.

Superficially, it might appear that to require a union at this late date to accept a reformed document other than that which its membership subsequently ratified (even though they had previously ratified the reformed document), would not be conducive to preservation of labor peace. However, it must be recognized that the very act of presenting the erroneously prepared formal document to the membership constituted an unchallenged act of bad

faith by the union's chief negotiator. Inherent in every phase of collective bargaining activity is a covenant of good faith. It would be unconscionable and most positively destructive of long range preservation of industrial peace, to promulgate a rule which would, on its face, encourage or reward an act of bad faith.

The written contract between the parties, having been embodied in the union letter of May 15, it, and it alone, remains as the effective contract for the period of time it purports to cover. The formal document subsequently executed by the parties should be reformed to conform to the actual contract.

The learned trial court wisely entered the following conclusion of Law No. 5:

> That if reformation should be finally determined as the appropriate remedy then a question of interpretation will arise, subject to arbitration under the contract, as to whether the union as a whole or the individual members have an option of $.03 per hour or increased vacation benefits.

No error having been assigned thereto, it became the law of the case and should be complied with.

The judgment appealed from is reversed and this case remanded with instruction to enter judgment consistent herewith.

ARMSTRONG, C. J., and HOROWITZ, J., concur.[4]

---

[4]Judge Horowitz participated in this case by order of the Chief Justice of the Supreme Court. Judge Pearson disqualified himself as he had formerly represented one of the parties.