[No. 642-2.    Division Two.    February 8, 1973.]

JACK L. WALTERS, *Appellant*, v. CENTER ELECTRIC, INC., *et al.*, *Respondents*.

*Robert A. Comfort* (of *Comfort, Dolack, Hansler & Billett*), for appellant.

*Harold T. Hartinger* and *Kane, Vandeberg & Hartinger*, for respondents.

PETRIE, J.—Center Electric, Inc., was founded by defend-

ant Carl E. Strock in 1944. He has continued as majority stockholder ever since. The business consists mainly of the sale, repair and rebuilding of electric motors and related products used in commercial and industrial enterprises in the Tacoma area. Jack L. Walters, plaintiff, is an engineer who has extensive experience in the sale and marketing of electrical products. Walters joined Center as its general manager on May 1, 1966. He was subsequently elected to the board of directors and appointed as the secretary-treasurer. The employment agreement as manager was oral, effectively terminable at the will of either party.

On October 1, 1966, the parties executed two written contracts. Under the first, a stock-purchase contract, Walters agreed with Center to purchase 24 shares of its treasury stock for $40,800, thereby becoming a one-third owner of Center's stock.[1] He paid $10,000 down and the balance at the rate of $250 or more per month (except as modified by the contract) to be applied to principal and interest. Under the second, a buy-sell contract, Strock and Walters, as stockholders, agreed with Center, and also between themselves, to impose certain restrictions on the disposition of stock during the lifetime of the stockholders and also after the death of either of them.

Center encountered serious business difficulties in 1968. Because of differing concepts of managerial responsibilities, the relationship between Strock and Walters became somewhat strained. Somewhat typical of that strained relationship is Walters' description of an encounter he had with Strock in 1969: "Either you have to run the business or I have to, and this is why I came into the business was to run it, so you have got to let me run it. And if you won't, you got to leave or I have got to leave." The two were unable to reconcile their differences, and Walters' employment as manager was terminated on April 30, 1969. On May 15, 1969, Walters tendered payment of interest only on the

---

[1] Actually, Strock owned 50 shares and one other person, not a party to this action, owned one share. All parties have ignored the minor fractional discrepancy.

stock-purchase contract, which was accepted by Center without objection. For the payment due June 15, 1969, Walters tendered the nominal sum of $1 which was rejected by Center. On July 1, 1969, Center gave Walters written notice that he was in default under the stock-purchase agreement. The notice recited that Center would elect to declare the entire sum remaining unpaid on the stock-purchase agreement to be immediately due and payable if the full $250 per month payment required on July 15, 1969, and monthly thereafter, remained unpaid. Walters refused to make any payments after his June tender of $1.

On July 16, 1969, Walters received written notice from Center declaring the entire sum remaining unpaid under the stock-purchase contract immediately due and payable. The notice made demand for full payment within 30 days and stated that in the event none was made, Center elected to return the principal payments already made by Walters in 60 equal monthly installments. On August 15, 1969, and monthly thereafter, Center tendered an installment of the principal and each time it was rejected.

Walters initially filed a stockholder's derivative action in May, 1969, to recover assets of the corporation which Strock had allegedly converted to his own use. On August 18, 1969, Strock deposited his check in the amount of $2,000 with the clerk of court pursuant to RCW 4.84.120. Walters rejected the tender, but subsequently took a voluntary nonsuit.

In July, 1970, Walters filed a "Complaint for Specific Performance of Contracts and Damages" seeking (1) a determination that both agreements be found valid and subsisting; (2) specific enforcement of the terms thereof; (3) an accounting from the "defendant Center Electric, Inc., and defendant Carl E. Strock as its principal stockholder" for all payments, dividends and other credits to which plaintiff was entitled on his purchase of stock; (4) delivery by Center to an escrow agent "an amount equivalent to all sums paid by plaintiff, his salary deductions, and any and all declared and undeclared dividends, credits and other

offsets, and statutory interest" on such items; (5) a declaration that all unlawful actions of Center's board of directors and stockholders be set aside and held for naught; and (6) that Center and Strock be restrained from disposing of Center's capital stock in any manner contrary to the agreements between the parties. By answer and cross complaint, defendants sought (1) dismissal of the complaint; (2) an adjudication under the Uniform Declaratory Judgments Act, RCW 7.24.010, *et seq.*, determining the rights of the respective parties under the contracts; and (3) reasonable attorneys' fees. During trial the complaint was considered amended, pursuant to evidence introduced, so that Walters also sought pay for vacation time accrued but not taken.

On September 27, 1971, after trial to the court, the trial court entered a "Judgment and Decree" (1) directing judgment against Center in the sum of $1,184.33 for accrued but unused vacation pay; (2) directing judgment against Strock and his wife "in the sum of $2,000 in satisfaction of the plaintiff's claims against said defendants" (constructive dividends); (3) declaring that plaintiff had no right, title or interest in Center's stock; (4) terminating Walters' stock-purchase rights in the stock-purchase agreement; (5) directing judgment against Center in the sum of $15,064.30 as repayment to Walters of the principal payments he had made under the stock-purchase agreement; (6) directing that all rights and interests under the stockholders' buy-sell agreement had expired and neither of the parties had any rights, interests or claims surviving such expiration; and (7) denying Center's claim for attorneys' fees. Walters' appeal and Center's cross-appeal challenge the listed elements of the judgment and decree, which we shall consider seriatim. In addition, Walters has assigned error to the trial court's denial of prejudgment interest for accrued vacation pay, constructive dividends and repayment of principal.

## VACATION PAY

Before considering whether or not Walters was entitled to judgment for pay in lieu of vacation time accrued

but not taken, we deem it expedient to point out that we do not resolve this issue by reference to federal labor law. The criteria applied under federal labor law are distinctly different from the standards for interpretation of local law. *See Concrete Tech. Corp. v. Laborers' Int'l, Local 252, 3 Wn. App. 869, 479 P.2d 125 (1970)*. Clearly, also, we are not interpreting a collective bargaining agreement nor are we interpreting any statute which pertains to vacation pay or vacation time. Neither are we ascertaining whether or not pay in lieu of vacation constitutes "wages" under a wage payment act such as RCW 49.48.010.

The terms and conditions of Walters' employment at Center insofar as they pertain to vacation rights are all spelled out in the trial court's unchallenged findings. Under company policy, Walters accrued 1 week of vacation time as of the end of the first year of his employment. He accrued 2 weeks of vacation time as of the close of each year after the first year of his appointment. There was no evidence as to the total amount of vacation time which an employee of Center might accrue, but the trial court found that Walters' 3⅔ weeks of vacation time accrued but not taken as of April 30, 1969, was reasonable under the circumstances. Walters was free to fix his own vacation schedule and the decision to forego vacations was his own choice, not imposed upon him by, or in behalf of, Center. At termination of his employment his gross weekly salary had been $323. Center made no payment to him for his accrued but unused vacation time. Center had no policy of granting employees a choice between vacation time or extra pay.

The amount of vacation time to which an employee is entitled is determined by the terms of the employment contract. Vacation time earned but not taken may accrue to the extent permitted under that contract. An employee may utilize his accrued vacation time at any time during his employment, subject, however, to reasonable scheduling thereof by the employer.

Under that concept of vacation time, an employee acquires the contractual right to absent himself from work

for the period of his accrued vacation, or any part thereof, subject to scheduling by his employer, and to continue to receive his regular pay during the period of his absence. In other words, the right to vacation time is the right to continue to receive one's regular salary even though absent from work for a stated period of time. It is not, however, a right to continue to work full time, receive full wages, and also receive additional pay in lieu of absenting oneself from employment. This latter arrangement is a right, obtainable contractually through the employment contract, known as the right to receive pay in lieu of or in satisfaction of vacation time. It is a right, therefore, to receive extra compensation. In that sense it is akin to a right to receive overtime pay.

All services rendered by an employee during the period for which he is employed, of a nature similar to those required of him in the course of his regular duties, are presumably paid for by his regular salary. In order to overcome this presumption an employee must establish that the contract of employment, expressly or impliedly, provides for extra compensation. *See* 53 Am. Jur. 2d *Master and Servant* § 76 at 151 (1970) and cases cited therein.

There is nothing in Mr. Walters' contract of employment which expressly grants the right to extra compensation—pay in lieu of vacation time. He directs our attention, however, to *Powell v. Republic Creosoting Co.,* 172 Wash. 155, 19 P.2d 919 (1933). In *Powell,* the court determined that regular payment of a substantial annual bonus over a long period of time established the bonus as more than a gratuity; impliedly the bonus became a condition of the employment contract. There is no factual basis, in the case at bench, to create an implication that Walters' accrual of vacation time evolved by implication into a right to pay in lieu of vacation. Accordingly, Walters has failed to establish his right to vacation pay in lieu of vacation time. The judgment of the trial court, to the extent that it awarded Walters judgment against Center in the amount of $1,184.33, must be modified.

## CONSTRUCTIVE DIVIDEND

During the 3 years Walters was employed at Center he acquired information about several matters which somewhat vexed him, but, prior to termination of his employment, against which he did not expressly protest or otherwise make known any objections. Among these matters were a write-off as a corporate bad debt an account receivable from Strock, which had been carried on the books for some time; use of a company credit card to pay for gasoline used in Strock's personal car and boat; and deposit into a cash box kept in Strock's desk, amounts of money, sometimes used by Strock for personal benefit, derived from sale of used copper wire which belonged to Center. In May, 1969, Walters, in his own behalf and on behalf of other of Center's stockholders, brought an action against Center and Strock, alleging in part, under a first cause of action, that he had standing as a stockholder of Center and that the action was "a derivative action brought by plaintiff in the right and for the benefit of the corporation"; seeking on behalf of Center an accounting between Strock and Center of the considerable sums of money and property which Strock had allegedly converted to his own use, and seeking also judgment for the accounting balance determined to be due from Strock. On August 18, 1969, the defendant Strock deposited with the county clerk his personal check payable to the clerk (dated August 14, 1969) in the amount of $2,000 as a tender pursuant to RCW 4.84.120 and, for purposes of that action only, admitted "that said sum represents the amount due, together with all costs that have accrued to date, on the plaintiff's first cause of action." Walters did not accept the tender, but on April 21, 1970 he filed a motion for, and was granted, a voluntary nonsuit.

In the proceedings in the case at bench the trial court found, and all parties have accepted, that Strock at all times treated and represented that the tender in the prior action was to be considered a continuing tender to Walters as an amount not less than one-third of all monies, properties, assets, and other items of value received by Strock

as dividends from Center, whether declared as such or not, including all items which were the subject of Walters' stockholder's suit in the prior action. The trial court also found, and all parties accept, that the total of all such claims, while Walters held stock-ownership rights in Center, did not exceed $6,000.

██ Walters has assigned error to the trial court's additional finding that "The tender and stipulation of Strock for payment of $2,000 to Walters in full satisfaction of all claims is reasonable in amount and no greater sum is justified under the evidence", and to that portion of the judgment awarding him judgment against *Strock* in the sum of $2,000. He insists that he has no personal damage claim against his fellow stockholder, Strock, for dividends Strock may have received. He contends, rather, that his rights flow from his relationship to the corporation and that the trial court should have entered judgment in his favor against *Center* in the amount of *$3,000*. His theory is that Center paid Strock, who owns two-thirds of the stock, a dividend of $6,000; therefore, Center should now pay Walters, who owns one-third of the stock, a dividend of one-half the amount it had already paid to Strock. (Strock's actions are probably breaches of trust, but all parties prefer to categorize them as "undeclared dividends.") Walters misconstrues his rights under a stockholder's derivative action with his rights under an action to compel a corporation to declare a dividend. Under the former, the corporation is the real party in interest and the minority stockholder who brings the action is at best only a nominal plaintiff seeking to enforce a right of the corporation against a third party; *Ross v. Bernhard,* 396 U.S. 531, 24 L. Ed. 2d 729, 90 S. Ct. 733 (1970); *Goodwin v. Castleton,* 19 Wn.2d 748, 144 P.2d 725, 150 A.L.R. 859 (1944). Under the latter, the stockholder is seeking to enforce a right common to himself and other stockholders *against* the corporation and not against any third party. *Doherty v. Mutual Warehouse Co.,* 245 F.2d 609 (5th Cir. 1957). In any event, Walters has cited no authority, nor do we know of any, which holds that a

corporation is liable proportionately to all of its stockholders after it has been determined that one of them has been found to have wrongfully received corporate assets to which he was not entitled.

Actually, of course, the trial court in *this* action would have had no authority whatsoever to enter a judgment in favor of Center against Strock. The trial court's judgment, as to this item, was the only possible course of action the trial court could have taken in Walters' behalf. In effect, the trial court determined that the corporation had unwittingly permitted a dividend, $4,000 of which should have gone to Strock and $2,000 of which should have gone to Walters. Through no fault of the corporation, but with lack of immediate remedial action by Walters, the entire $6,000 went to Strock; Strock should now reimburse Walters for the amount of the dividend which he (Strock) now unjustly held. We agree with the trial court's resolution of this issue.

### Stock-Purchase Agreement

The factual circumstances between April 30, 1969, t.., date of termination of Walters' employment and August 15, 1969, the date on which Center now contends the stock-purchase agreement terminated, have been recited above and are not in dispute.

Walters asserts several reasons why he was never in default and several other reasons why, if he should be considered in default, his interest in the stock should not have been terminated, all of which we summarize into four categories as follows: He contends (1) he was not in default because under the stock-purchase contract his payments were reduced below $250 per month until his salary once again returned to or exceeded $1,200 per month; (2) he was not in default because at the time Center gave him notice of default it owed him money in excess of the normal monthly payments then due and owing, which not only offset the required payments but resulted in substantial prepayment of his contractual obligations; (3) Strock's se-

cret withdrawal of Center's property as "declared or undeclared dividends" constituted a material breach of the stock-purchase contract which, at the very least, provided sufficient grounds to permit Walters to reestablish or renew the agreement upon compliance with equitable terms; and (4) termination of his contract purchase rights constitutes an unreasonable forfeiture and penalty, which equity should not enforce without granting him the privilege of reinstatement under equitable terms.

The basic dispute between Walters and Center revolves around the meaning of three paragraphs in their stock-purchase contract, the pertinent portions of which provide:

3. All payments to be made by the Purchaser [Walters] shall be made to the Escrow Agent.
*All payments required to be made by the Purchaser shall be made* to the Escrow Agent directly by the Seller [Center] *through deductions from the salary earned by the Purchaser* and such payments shall be remitted on a monthly basis pursuant to the requirements of this agreement.

. . .

4. *In the event of the reduction of the salary of the Purchaser below $1,200.00 per month, there shall be a proportionate reduction in the monthly payments* covering principal and interest during such time as such reduction is in effect.

5. . . . In the event that the Purchaser defaults in the payment of any of the payments due on the purchase price, the Seller may then declare the entire sum remaining unpaid to be immediately due and payable. If Purchaser shall fail to make full payment within thirty (30) days after written demand to this effect is made upon him, then the Seller shall be obligated to return to Purchaser a sum equal to all payments made by Purchaser and applied on the principal to the date of default, and Purchaser shall have no further rights in the stock being purchased. Seller shall have the option to return payments made either in cash or in sixty (60) equal monthly payments.

(Italics ours.)

It should be noted that although the parties referred to

an "Escrow Agent" in the formal documents executed, they never did utilize the services of such an agent. Instead, $250 or more was withheld from Walters' pay on or about the 15th of each month, and the amount deducted was credited to payment of principal and interest.

■■ Walters' primary contention in this action is that paragraph 4 is so eminently clear that no additional evidence is necessary to aid in its interpretation. He asserts, therefore, that he was temporarily absolved from paying anything on principal and interest until such time as he once again received "salary" from some other source. Center, on the other hand, contends that the agreement as a whole is sufficiently ambiguous so that resort to extrinsic evidence is warranted in order to ascertain the true intent of the parties. The trial court found sufficient ambiguity as to the true meaning of the contract and, accordingly, permitted documentary and parol evidence as to the circumstances surrounding the formation of the contract. We agree. Considering the agreement in its entirety, which we obviously must, there is sufficient ambiguity concerning the true meaning which the parties intended to convey, both as to the amount and method of payment and also to the significance of a default provision when payments are deducted from salary, to warrant explanation of how the final contract came into existence and what the parties intended overall. Ambiguity can develop through error of omission as well as through error of commission. Having ascertained that an ambiguity existed, it became the duty of the trial court to determine the true intent of the parties by viewing the contract as a whole and considering the circumstances leading up to its execution. *Eagle Ins. Co. v. Albright*, 3 Wn. App. 256, 474 P.2d 920 (1970). The trial court found as an unchallenged fact that all parties "assumed that Walters' employment as general manager would continue indefinitely," and that both documents were negotiated and executed "with intent and purpose that they constitute a single transaction." The trial court's other findings as to intent of the parties have been challenged by Walters.

However, we find substantial support in the record, from examination of the method by which the ultimate contract evolved through the several draft stages and the method of initiation of the proposal for possible reduction in monthly payment obligation, to support the trial court's two key findings: (1) "It was *not the intent* of the parties that the deduction provisions of paragraph 3 be interpreted *as a limitation* upon the monthly payment obligation imposed by paragraph 2 [$250 or more per month] of the stock-purchase agreement," but rather (2) "it *was the intent* of the signers that the amount of the monthly payments due under paragraph 2 be reduced in proportion to the reduction in Walters' *salary from Center Electric* where that reduction was forced by economic conditions affecting Center Electric." (Italics ours.)

Having resolved the issue of the true intent of the parties in this manner, it follows that termination of Walters' employment with Center did not reduce or terminate his obligation to pay Center $250 per month until his "salary" with some other employer might reach $1,200 or more. Walters urges us to declare that the trial court's resolution of this issue effectively rewrites the parties' contract. In his reply brief he emphasizes his continuing indebtedness to Center for the balance of the stock-purchase price with a payment due "in an amount proportionate to his salary reduction from 1969 through date." The trial court simply determined from the evidence as a whole, that that interpretation was not the true intent of the parties when the contract was executed. The trial court did not rewrite the contract, but merely enforced the same in accordance with what he determined factually was that true intent.

It follows, therefore, that on June 15, 1969, Walters' contract obligation was to pay Center $250 on the purchase price. We examine, then, Walters' next assertion that when he left Center he had offsetting money due from Center such that he had actually prepaid his contract obligation. We have already determined that Center did not owe him any payment for vacation time accrued but not taken. He

directs our attention, however, to paragraph 8 of the stock-purchase agreement, the pertinent portions of which provide:

> 8. One-half of any dividends payable on the stock that is the subject of this sale and one-half of any bonuses paid by Seller to Purchaser by virtue of Purchaser's employment by Seller shall be paid to the Seller and shall reduce the purchase price by the amount of the dividend or bonus received by the Seller.

Walters contends that, minimally, the $2,000 "constructive dividend" should be applied, one-half to reduce the purchase price of the stock and the other one-half stands as an offsetting claim against the corporation, which would have provided at least four monthly payments at a time when he was being held in default on his contractual obligations. We have some difficulty in following the precise flow of his logic. It has been determined that Strock converted $6,000 of corporate assets to his own benefit during the 3 years Walters was a minority stockholder. Incidentally, in view of the more than 20 years that Strock was practically the sole owner of the corporation, it can hardly be said that his actions between 1966 and 1969 were severely reprehensible. Had Walters pursued his initial derivative stockholder's action, the most beneficial judgment he could have obtained would be a return *to the corporation* of the $6,000 which Strock improperly used for his own benefit. In the present action, which he did pursue, the most beneficial judgment he could have received is the judgment entered by the trial court—a $2,000 judgment against Strock, but not against Center. As we view this record, Center did not owe Walters any money on or after May 1, 1966—the day following termination of his employment.

Walters' next contention is that Strock's "secret withdrawal" of corporate property resulted in a breach of paragraph 8 of the stock-purchase agreement. His position is that Center never reduced the stock-purchase price by the amount of any dividends. We cannot conceive that Strock's actions imposed any liability upon Center. More particu-

larly, in no event could Center's violation, if any, constitute a *material* breach of paragraph 8 sufficient to bar enforcement of Center's forfeiture notices. It must be remembered, that the alleged violation is Center's failure to reduce the purchase price by one-half of the amount of any "dividend" which should have been declared in Walters' favor at the time each "taking" occurred. It is true that, if one-sixth of each "taking" had been considered a payment on principal, Walters' interest obligations would have been reduced slightly. We cannot conceive that that type of breach could in any sense of the word constitute a material breach of the contract which would warrant nonpayment of the monthly payment due on the contract.

Walters' final argument is a plea to the equity powers of the court to grant him an opportunity to reinstate the contract because enforcement of the termination notices would result in a forfeiture coupled with a penalty, which equity abhors. It should be noted that Walters' payments on the principal due on his contract will all be returned to him. Only his interest payments will not be returned. In that sense he has forfeited his interest payments, but for 3 years he has had voting rights in stock, full ownership of which he had not yet acquired. We see no unconscionable forfeiture, but merely a termination. There is no error in the trial court's decision to terminate Walters' right, title or interest in Center's stock.

### Effect of Termination

It hardly needs recital that one of the immediate effects of termination of Walters' ownership of stock necessarily includes expiration of the rights of all parties in the buy-sell agreement. Ownership of stock is a necessary prerequisite to continuation of the buy-sell agreement. The trial court properly determined that the rights of all parties in the buy-sell agreement had expired.

Through its cross-appeal, Center challenges the decision of the trial court which requires Center to pay back Walters' principal payments in one lump sum of $15,064.30

instead of in 60 equal installments as provided by the terms of paragraph 5 of the stock-purchase agreement. The trial court required Center to repay Walters in one payment because Center's tender of amounts due Walters was determined to have been insufficient. We disagree. We have already disposed of the vacation pay issue. Strock's tender of $2,000 return of "dividend" on August 18, 1969, was certainly timely. Certainly, also, Center's return of the first of 60 installments was quite consistent with the terms of the contract. In accordance with the trial court's avowed intention to enforce the provisions of the contract, we conclude that repayment should have been permitted in 60 equal installments.

At this late date, it would be inappropriate to permit Center to now commence installment repayments. Accordingly, the judgment should be modified to require Center to repay Walters in an amount equal to the amount which would have been paid in installments between August 16, 1969 and 30 days after the remittitur herein shall have been entered; any balance remaining to be repaid may be repaid in installments thereafter.

Finally, we determine, without further discussion, that the trial court properly denied prejudgment interest on Walters' claims of repayment of principal and "dividends." Similarly, without necessity of discussion, the trial court properly resolved any ambiguity in the attorneys' fee clause of the contract in favor of Walters. Accordingly, we affirm the trial court's denial of attorneys' fees to Center.

Judgment affirmed as modified herein.

PEARSON, C.J., and ARMSTRONG, J., concur.

Petition for rehearing denied April 9, 1973.

Review denied by Supreme Court June 7, 1973.