VALEO, Appellant, v. J. I. CASE COMPANY, Respondent.

*November 28, 1962—February 5, 1963.*

580

For the appellant there was a brief by *Raskin & Zubrensky,* attorneys, and *Max Raskin* and *Herbert S. Bratt* of counsel, all of Milwaukee, and oral argument by *Mr. Max Raskin* and *Mr. Bratt.*

For the respondent there was a brief by *Robertson, Hoebreckx & Davis,* attorneys, and *John G. Vergeront* of counsel, all of Milwaukee, and oral argument by *Mr. Vergeront.*

FAIRCHILD, J. Entitlement to vacation pay is a matter of contract.[1]

The basic problem in this case arises because the termination date in the collective-bargaining agreement is February 29th and the eligibility date for determining vacation rights is June 1st. The agreement contains no provision which expressly solves the problem.

The agreement, by its terms, was capable of perpetual existence, but either party was free to terminate it as of the last

[1] *Skibb v. J. I. Case Co.* (1949), 255 Wis. 447, 39 N. W. (2d) 367; *Darling v. Industrial Comm.* (1958), 4 Wis. (2d) 345, 360, 90 N. W. (2d) 597; *Cutler-Hammer, Inc., v. Industrial Comm.* (1961), 13 Wis. (2d) 618, 109 N. W. (2d) 468; *Oglebay Norton Co. v. Industrial Comm.* (1962), 15 Wis. (2d) 396, 113 N. W. (2d) 35.

day of February of 1960 or any subsequent year. If ever so terminated, the present problem was bound to arise. Would the employees who had performed service under the agreement for nine months since the preceding June 1st acquire and retain any valuable rights under the vacation provisions, or would such rights expire with the agreement? The parties might have included a provision expressly providing an answer, but they did not. It thus becomes necessary to provide an answer by construction.

Plaintiff claims that vacation rights vested in the employees as they performed enough days of service to qualify them for vacations under the formula in sec. 1 of Art. IX of the agreement, and that neither the termination of the agreement nor the ensuing strike extinguished those rights. The company argues, in the first place, that no vacation rights ever accrued except on a June 1st falling within the life of the agreement. Hence, the agreement having been terminated before June 1, 1960, the employees acquired no vacation rights by virtue of services performed from June 1, 1959, to February 29, 1960, even though the agreement was in force during that period, and even though vacation rights would have been measured by such services had the agreement remained in force through June 1, 1960. In the second place, the company points out that the agreement requires the employee to take his vacation in order to receive vacation pay and argues that even if the employees did acquire rights to take vacations during the summer of 1960, they were not on vacation, but on strike, and were therefore not entitled to vacation pay.

1. *Vacation rights were earned while agreement was in force and were not extinguished at its termination.* Contractual vacation rights are additional compensation for service performed although subject to conditions tending to promote the employer's interest in continuity of service.

"In the absence of something in the contract to the contrary, vacation pay is in the nature of additional compensation for services rendered." [2]

"A vacation with pay is in effect additional wages. It involves a reasonable arrangement to secure the well-being of employees and the continuance of harmonious relations between employer and employee. The consideration for the contract to pay for a week's vacation had been furnished, that is to say, one year's service had been rendered prior to June 1st, so that the week's vacation with pay was completely earned and only the time of receiving it was postponed." [3]

"The authorities generally appear in agreement as to the category in which vacation pay is to be placed. They agree generally that it constitutes a form of additional earnings and is not to be regarded as a gratuity or a gift." [4]

"Decisions have made clear that a contractual provision for vacation with pay is neither a gratuity nor a gift. It is a supplement to the employment agreement which in effect constitutes an offer of reward or additional wages for constant and continuous service." [5]

Vacation provisions rarely, if ever, permit the employee to collect a fraction of his vacation pay each time he receives wages. By their nature, they ordinarily require the fulfilment of various conditions tending to promote the employer's interest in continuity of employment. The agreement in this case provided that employees who quit, are discharged, or fail to return to work when recalled after layoff shall forfeit all rights to vacation pay, even though otherwise eligible.

---

[2] *Pattenge v. Wagner Iron Works* (1957), 275 Wis. 495, 498, 82 N. W. (2d) 172.

[3] *In re Wil-Low Cafeterias* (2d Cir. 1940), 111 Fed. (2d) 429, 432.

[4] *Livestock Feeds v. Local Union No. 1634* (1954), 221 Miss. 492, 502, 73 So. (2d) 128, 131.

[5] *Division of Labor Law Enforcement v. Ryan Aeronautical Co.* (1951), 106 Cal. App. (2d) Supp. 833, 836, 236 Pac. (2d) 236, 30 A. L. R. (2d) 347, 350.

If vacation rights be thought of as accruing or vesting in employees as they perform services, such accrual is qualified at least to the extent that conditions of the type just mentioned, employee status on the eligibility date, and the like, must also be met.

As previously stated, the termination date referred to in the agreement before us occurs nine months after the preceding eligibility date (and three months before the succeeding eligibility date). It does not seem reasonable that the parties intended that enjoyment of potential vacation rights based on, and being additional compensation for, services rendered during three quarters of a year should be extinguished if one of the parties chose to terminate the agreement at the end of February. Although it is true in the present case that termination was at the instance of the union and in a sense chargeable to the employees whom the union represented, termination could, so far as the agreement provided, have been effected by the company. Again, it does not seem reasonable that the parties intended that loss of vacation rights should be a consequence of termination and not only a penalty or disadvantage to be faced by the union in deciding to terminate the contract but also a bonanza or advantage which the company could obtain by termination.

It seems to the majority of this court more compatible with the nature of vacation pay as compensation for work performed to hold, in the absence of provisions to the contrary in the agreement, that it accrued as services were performed under the agreement for the nine months prior to termination, such accrual being qualified only by the possibility of forfeiture of vacation rights under sec. 3 of Art. IX or failure to be in employee status as of June 1, 1960, but not being extinguished by the termination of the agreement. A similar result was reached by the supreme court of Mississippi, although in that case the termination of the agreement was effected by the employer and, in addition, the employer dis-

continued its business, thereby terminating the employment as well.[6]

An appellate court in New Jersey reached the same conclusion in a situation even more closely similar to the one before us. The union terminated the agreement as of April 30, 1951, and a strike ensued. The agreement provided for determination of eligibility for vacation as of June 1st and the court held that notwithstanding the termination of the agreement and the ensuing strike the employees were entitled to their vacation rights. The court said:[7]

"Were the vacation benefits earned by these employees while the contract was in effect, and to which they as employees on June 1st were entitled under the terms of the contract, conditioned upon the existence of the contract on June 1st? We think not. Although the contract made specific provision that either the employer or the union could terminate the contract as of April 30th of any year, by giving the required notice of such intention to the other party, no provision was made concerning the effect of such termination on the rights of employees to vacation benefits earned while the contract was still in effect. However, the contract did provide that if an employee died, or if bankruptcy, permanent cessation of plant operations, sale, or removal of the business from the jurisdiction of the union local, occurred before June 1st, the vacation pay would become immediately payable to the employee or to his heirs. We consider this last-mentioned provision a strong indication of the intention of the parties that an employee should not be deprived of vacation benefits earned while the contract was in effect, except as specifically provided in the contract; namely, if the em-

[6] *Supra,* footnote 4.

[7] *Textile Workers Union v. Paris Fabric Mills* (1952), 22 N. J. Super. 381, 384, 92 Atl. (2d) 40, 41. See *Textile Workers Union v. Paris Fabric Mills* (1952), 18 N. J. Super. 421, 87 Atl. (2d) 458. Also see *Kidde Mfg. Co. v. United Electrical Radio & Machine Workers* (1953), 27 N. J. Super. 183, 99 Atl. (2d) 210, and *Botany Mills, Inc., v. Textile Workers Union* (1958), 50 N. J. Super. 18, 141 Atl. (2d) 107.

ployee quit or was justifiably discharged before June 1st. Further, let us suppose the employer instead of the union had terminated this contract as of April 30th. We think it clear that the parties to this contract had no intention that such a termination would deprive the employees of all vacation pay earned during the eleven months the contract was in force. There is nothing to indicate any intention that a different result should occur if the union instead of the employer terminated the contract."

As also pointed out by the New Jersey court in the case above cited (at page 384), the relation of employer and employee existed on the eligibility date succeeding the termination of the agreement notwithstanding the fact that the employees were on strike.[8]

*2. Existence of strike throughout vacation period does not prevent collection of vacation pay.* The agreement provides that an employee "must actually take his vacation in order to receive his vacation pay." The company contends that even if its employees acquired vacation rights for 1960 they failed to take vacation and therefore under the agreement were not entitled to the pay.

The employees were absent from work for the entire period during which the agreement provides that the vacations should be assigned, from June 1st to September 15th. The majority of this court conclude that the purpose of the terms just quoted from the agreement was to prevent employees from working throughout the vacation period and drawing vacation pay in addition to wages without the consent of the company. The purpose of this provision has been fulfilled here. The employees are not pyramiding vacation pay on top of wages. Absence on strike was not included in the agreement among the grounds for forfeiture of earned vacation if, indeed, such a provision would have been lawful.

[8] See also *Marathon Electric Mfg. Corp. v. Industrial Comm.* (1955), 269 Wis. 394, 405, 69 N. W. (2d) 573, 70 N. W. (2d) 576.

The company relies on a statement in our decision in *Oglebay Norton Co. v. Industrial Comm.*[9] as follows:

"It seems to us, however, that absence from work with leave of the employer or in exercise of contractual vacation rights is so different in nature from absence in support of or because of a strike that the contract should not be construed so as to compel the employer to treat absence during a strike as vacation unless the terms of the contract clearly require that result."

The *Oglebay Norton Case,* like most of the recent decisions of this court dealing with contractual vacation rights,[10] involved a situation where the entitlement of employees to vacation pay was conceded but the parties were in dispute as to whether the agreement prevented the employer from allocating vacation pay to a period of absence which would be advantageous to it under the operation of the Unemployment Compensation Law rather than to a period which would be advantageous to the employees under that law. In *Oglebay Norton, supra,* the employer had originally designated a particular period for a plant-wide vacation, but when it developed that a strike would be in progress during that period, the employer announced a postponement of the vacation schedule until after the strike. The employees claimed that a particular provision of the agreement prevented the employer from postponing the vacation period originally designated and the statement above quoted was made with reference to the construction of that provision. We made it clear, however, at page 406, that under some circumstances the agreement would have required the vacation pay to be allocated to a period during the strike.

[9] *Supra,* p. 406, footnote 1.
[10] *Darling v. Industrial Comm., supra,* footnote 1; *Danielson v. Industrial Comm.* (1958), 4 Wis. (2d) 367, 90 N. W. (2d) 608; *Cutler-Hammer, Inc., v. Industrial Comm., supra,* footnote 1.

The company in the present case did, during the summer of 1960 and during the strike, send out notices designating particular periods for taking vacations, conditioning them, however, upon a return to work before the vacation period began. As we construe the agreement, however, the employees' vacation rights had already vested and the agreement gave the company no right to condition the employee's right to receive his vacation upon his withdrawal from the strike.

3. *Alleged settlement of dispute in agreement of September 19, 1960.* The company contends that any claim of the employees for vacations for 1960 was disposed of by a provision appearing in the new collective-bargaining agreement, entered into at the close of the strike, dated September 19, 1960. The provision reads as follows:

"This agreement disposes of any and all bargainable issues, whether or not presented during negotiations, except with respect to the processing of grievances as provided in Article IV, and shall remain in full force and effect without further change until the expiration thereof except with respect to the items included in the reopening provision in Section 2 of Article XIII."

The company correctly points out that part of the negotiations were concerned with the demand of the union for improved vacations in 1960. The plaintiff counters with the proposition that while the employees were seeking more-favorable vacation provisions, the union was not bargaining with respect to rights already vested in individual employees. It is a general principle that the union does not have the right to bargain away vested and accrued rights of individual employees.[11] As indicated in the statement of facts, the

[11] *Clark v. Hein-Werner Corp.* (1959), 8 Wis. (2d) 264, 99 N. W. (2d) 132, 100 N. W. (2d) 317, and *Dehnart v. Waukesha Brewing Co.* (1962), 17 Wis. (2d) 44, 115 N. W. (2d) 490.

present action for vacation pay was commenced July 28, 1960, and the answer served September 8th. It seems improbable that the parties intended to compromise and settle the existing lawsuit by the entirely general language above quoted from the new agreement. If such settlement were intended and it was so understood by the parties, ratification of the new agreement by employees so understanding it would extinguish the rights of those employees even though the union did not have authority to bind them in the absence of ratification. Whether rights were so extinguished may present questions of fact to be resolved upon trial, but we cannot say as a matter of law that the claims of the employees for vacation pay for 1960 became extinguished by the execution of the new agreement.

4. *Statutory damages.* Plaintiff's complaint alleged an additional liability of the company to the employees for refusal to pay wages. This portion of the claim is founded upon sec. 103.39 (4), Stats., providing for an addition to the amount of wages or salaries due where an employer having the ability to pay shall fail to pay wages or falsely deny the liability therefor "with intent to secure any discount upon such indebtedness or with intent to annoy, harass, oppress, hinder, or defraud the person to whom such wages are due." If such an intent can be proved, it will be a matter to be raised upon the trial. We acknowledge that the proper construction of the vacation provisions of the agreement under the circumstances disclosed by the record presents considerable difficulty and the company's assertion that its refusal to pay was based upon its good-faith doubt as to its liability appears to be consistent with the facts so far disclosed. The burden would be upon the plaintiff to prove lack of good faith and the intent described in the statute.

Mr. Justice CURRIE, Mr. Justice GORDON, Mr. Justice WILKIE, and the writer of this opinion conclude that the

judgment dismissing the complaint must be reversed. Mr. Chief Justice BROWN, Mr. Justice HALLOWS, and Mr. Justice DIETERICH reach a conclusion opposite to the propositions stated in paragraphs numbered 1 and 2 of this opinion, and would affirm the judgment.

*By the Court.*—Judgment reversed; cause remanded with directions to deny defendant's motion for summary judgment, and for further proceedings.