NATIONAL RIFLE ASSOCIATION, Appellant,

v.

John C. AILES et al., Appellees.

No. 79–342.

District of Columbia Court of Appeals.

Argued March 20, 1980.

Decided March 5, 1981.

**818**

Stephen N. Shulman, Washington, D. C., with whom Joseph A. Artabane and Thomas E. Weil, Jr., Washington, D. C., were on the briefs, for appellant.

Mark A. Bayer, Washington, D. C., for appellees.

Before HARRIS, MACK and FERREN, Associate Judges.

FERREN, Associate Judge.

The National Rifle Association (NRA) appeals from a judgment entered on a jury verdict awarding seven of its former employees a total of $90,707.21, representing payment for unused leave accrued during their NRA tenure. NRA contends that (1) the trial court's instruction to the jury impermissibly shifted the burden to NRA to prove that the employees were not entitled to compensation for a portion of their unused leave, and (2) the trial court erred in denying NRA's motions for directed verdict, judgment notwithstanding the verdict, and a new trial, since NRA demonstrated, in any event, that the employees knew about—and thus implicitly had agreed to—an NRA policy limiting compensation for unused leave upon termination. We conclude that the challenged instruction is consistent with the prevailing rule in this jurisdiction. We also conclude that the trial court did not err in denying NRA's directed verdict and post-verdict motions with respect to appellees Ailes, Baggett, Davidson, and Joerg. However, we order entry of judgment notwithstanding the verdict denying damages to appellees Harper, Warye, and Hines.[1]

**I.**

On November 8, 1976, NRA discharged 80 employees, implementing a reduction-in-

---

1. We also reject NRA's contentions that the trial court committed reversible error by (1) admitting testimony concerning the employees' "subjective feelings and conclusions" and (2) declining to give NRA's requested instruction on the appropriate measure of damages. Even if we assume that some of the challenged testimony was admitted in error, such admission did not cause a substantial injustice to appellant requiring reversal. *See* Super.Ct.Civ.R. 61. As to the damages issue, we note that the jury awarded amounts consistent with the only evi-

force for management reasons.[2] NRA paid each employee all salary accrued to the date of separation, and also made a severance payment based on the individual's length of employment plus any amount due for unused leave (including vacation, sick, and compensatory leave) up to 30 days (or 225 hours).

On August 15, 1977, six of the 80 discharged employees, plus another who resigned,[3] filed suit for breach of contract to recover monetary compensation for accrued but unused leave in excess of the 30-day maximum paid by NRA. A jury trial began on October 16, 1978.[4] At the close of the plaintiffs' case, the court denied NRA's motion for a directed verdict. At the close of all the evidence, NRA moved once again for a directed verdict, which the trial court denied. The jury returned a verdict awarding plaintiffs damages totaling $90,707.21.[5] The court entered judgment on the verdict, whereupon NRA filed timely motions for judgment notwithstanding the verdict and, in the alternative, for a new trial. The trial court denied both motions. Pursuant to an agreement among the parties, NRA deposited in escrow United States Government Bonds with a total face value of $120,000 to stay the execution of judgment pending this appeal.

## II.

NRA contends, first, that in order for a discharged employee to recover monetary

compensation from an employer for accrued but unused leave, the employee must prove such entitlement by reference to an express agreement or uniform custom. According to NRA, the trial court misplaced the burden of proof by instructing the jury as follows:

A party who asserts the affirmative of an issue has the burden of proving it. This burden he must generally carry by what is termed a preponderance of the evidence....

Leave time is a form of compensation for services and once the services are rendered the right to secure the promised compensation is vested as much as the right to receive wages or other forms of compensation. Vested means fixed, accrued, settled, and absolute. In the absence of expressed agreement to the contrary plaintiffs have a right to recover the value of the promised compensation. *Such agreement to the contrary must be shown by the defendant, National Rifle Association of America....* [Emphasis added.]

As interpreted by NRA, this instruction relieved the plaintiff-employees from having to prove the existence of their contractual rights to payment for unused leave upon discharge from their jobs. Secondarily, NRA argues that, even assuming the law of this jurisdiction places the burden on the employer to show the employee's agreement to forfeit payment for accrued leave once

dence submitted on possible damages (*i. e.*, a stipulation showing total hours accrued above the alleged 225-hour limit, multiplied by the hourly salary rate each appellee was receiving upon termination), and that the court permitted appellant's counsel to argue NRA's theory of damages to the jury.

2. The severance notice informed the employees that "[t]he National Rifle Association [was] making a substantial force reduction to improve operational efficiency and assure the on-going financial strength." The discharges were effective the same day the severance notices were issued.

3. The seventh employee, Steven Hines, resigned from NRA on February 25, 1977, and was similarly paid for accrued leave only up to

the 30-day maximum. Hines was the only employee whose claim included compensatory leave.

4. The trial court had previously entered partial summary judgment in NRA's favor, denying recovery under D.C. Code 1973, § 36–603(d) (covering payment of wages upon discharge or resignation of employee and upon suspension of work).

5. The individual awards to the seven employees were as follows: John C. Ailes, $4,549.74; Rolfe E. Baggett, $4,146.36; William Davidson, $3,505.89; John A. Harper, Jr., $40,083.69; Steven Hines, $14,579.46; Robert C. Joerg, III, $3,657.30; Russell B. Warye, $20,184.77.

the right to leave itself has been established, the employees hereby implicitly made such an agreement, for they continued to work and receive compensation with knowledge of NRA's limitation on payment for unused leave upon termination.

A. The central question is this: when an employee is not required to take vacation or other paid leave as it accrues, and thus has unused leave at the time he or she is fired, is that employee entitled to payment for the unused leave, in the absence of an agreement or uniform custom to the contrary?

In this jurisdiction, *Jones v. District Parking Management Co.*, D.C.App., 268 A.2d 860 (1970), announced the controlling rule. Jones, a discharged employee, sued his former employer for accrued salary and earned vacation pay. He testified, without contradiction, that his initial agreement with his employer provided for a one-week vacation with pay after his first full year of service; that his paid vacations (which had increased to four weeks per year by the time of his discharge) were based on a March-to-March service year and always had been taken in the summer; and that, at the time of his discharge, he had not taken any of the vacation time earned during the previous March-to-March year. *Jones, supra* at 861.

The trial court found that Jones had been discharged for good cause and ruled that he thereby had forfeited his vacation pay

rights.[6] We agreed with the trial court's findings that Jones' "conduct [was] inimical to the best interests of [his employer], justifying his discharge." *Id.* (footnote omitted). We disagreed, however, that "it . . . automatically follow[s] that [Jones] should forfeit deferred vacation pay rights which have already been earned." *Id.* We held, rather, "that *in the absence of an agreement to the contrary* the fact that an employee was discharged for cause cannot operate to deprive him of earned vacation pay rights." *Id.* at 862 (footnote omitted) (emphasis added).

■ *Jones, supra*, squarely supports the employee's contention here: as a general rule, an employee who accrues but does not take vacation or other paid leave is entitled to monetary compensation for that leave upon discharge from employment, absent an agreement to the contrary. *Id.* at 861–62. *Accord, Smith v. Kingsport Press, Inc.*, 366 F.2d 416, 419 (6th Cir. 1966); *In re Wil-low Cafeterias, Inc.*, 111 F.2d 429, 432 (2d Cir. 1940); *Harbridge v. Greyhound Lines, Inc.*, 294 F.Supp. 1059, 1065 (E.D.Pa. 1969); *Berteau v. Wiener Corp.*, 362 So.2d 806, 808 (La.App.1978); *Textile Workers Union v. Paris Fabric Mills, Inc.*, 22 N.J.Super.App.Div. 381, 384–85, 92 A.2d 40, 42 (1952); *Pfeifer v. A.F. Lowes Lumber Co.*, 206 Or. 115, 123, 291 P.2d 744, 748 (1955); *Valeo v. J. I. Case Co.*, 18 Wis.2d 578, 585–86, 119 N.W.2d 384, 388–89 (1963).[7] It fol-

---

6. The trial court had credited the following evidence on the cause of discharge:

[Jones] and two other former employees of appellee had incorporated a competitive parking company in January 1968, which company had thereafter entered into a lease to operate and did operate a parking lot previously leased to appellee. [Jones] did not inform appellee of his connection with the new company and, even upon inquiry, told appellee's president that he had nothing to do with the operation of the company except that he had loaned money to some friends to organize it. [*Jones, supra* 268 A.2d at 861.]

7. *Contra, Lim v. Motor Supply, Ltd.*, 45 Haw. 111, 122, 364 P.2d 38, 44 (1961) (terminated employee is entitled to payment for unused leave only if he or she can show an "express agreement or uniform custom" to that effect); *Marine Inspection Serv., Inc. v. Alexander*, 553

S.W.2d 185, 188–89 (Tex.Civ.App.1977) (same); *Walters v. Center Elec., Inc.*, 8 Wash.App. 322, 327, 506 P.2d 883, 887 (1973) (same). These cases premise their holdings on a perceived "distinction between a privilege to accumulate vacation time from year to year, and a right to be paid for the accumulated vacation if not enjoyed." *Lim, supra* 45 Haw. at 120, 364 P.2d at 43. They say, accordingly, that the availability of paid vacations does not imply the availability of extra pay in lieu of vacations. That distinction and related argument, however, are too broad and thus miss the point. It is not implausible to argue that, as long as one is employed, he or she does not have an automatic right to cash in (instead of taking) accrued vacation leave, absent an agreement with the employer to that effect; for such an implied cash option would, in effect, be an implied right to work overtime for awhile at double pay—a right not ordinarily thought of when vacation is

lows that a discharged employee may establish a right to monetary compensation for accrued but unused leave by pleading and proving that (1) prior to performance of the work, there was an agreement entitling the employee to accumulate leave, and (2) as of the termination date he or she had accumulated the claimed number of days. Any qualification on that right—*i. e.*, any additional agreement between the parties limiting (or defeating) the employee's right to compensation for that leave[8]—is in the nature of an affirmative defense that must be pleaded and proved by the defendant-employer. *See* Super.Ct.Civ.R. 8(c); *see generally* 5 Wright & Miller, Federal Practice & Procedure: Civil §§ 1270–1271 (1969 & Supp.1979). Obviously, "[t]he burden of establishing the terms of a contract rests upon the party suing thereon." *Backus v. Veterans Cooperative Housing Ass'n,* D.C. Mun.App., 96 A.2d 513, 515 (1953). But that means establishing only the terms essential to recovery; it does not include proving the negative of the other party's assertion that the terms relied on are subject to a qualification (tantamount to another agreement) that defeats the claim.[9]

In summary, the rule of this jurisdiction is: (1) the right to accrue paid leave implies the right to compensation for unused leave

upon discharge from employment, and (2) once a discharged employee has established the right to accrue leave and the amount of leave unused, the employee is entitled to compensation for it unless the employer sustains the burden of proving "an agreement to the contrary." *Jones, supra,* 268 A.2d at 862. We turn, therefore, to the application of the rule.

■ B. We must consider, initially, whether the appellee-employees made a showing of their right to accrue leave sufficient to trigger the trial court's instruction. The answer unquestionably is yes; very simply, NRA conceded the issue. In paragraph 8 of their complaint, the employees alleged:

All vacation time, sick leave and compensatory time earned by each Plaintiff was a form of compensation for the work performed by each Plaintiff. Each increment of such time was based upon the length of service of each Plaintiff and upon time worked. As each increment of such time was earned, *the right to receive payment for such time became fixed and vested in each Plaintiff.* [Emphasis added.]

NRA answered, in part:

Subject to the aforesaid limitation of 225 hours maximum which could be accumu-

---

the issue. *See id.* at 121, 364 P.2d at 44. But we are concerned with a much narrower issue here: the compensation rights, if any, of an employee who is *discharged* before he or she has taken accrued vacation leave and thus has no more employment time in which to do so. Presumably the employer has permitted if not encouraged the employee to accrue rather than take vacation (while continuing to work for pay) on the premise that the employee will remain employed long enough to take it. Indeed, the employer has primary control over (1) the terms of employment and language of all material informing employees of their rights, obligations, compensation, and benefits; (2) the approval of all requests to use accrued leave time; and (3) the employee's exact termination date. *See Valeo, supra* 18 Wis.2d at 585, 119 N.W.2d at 388. It follows that, in discharge cases, the better rule is the one we have adopted in *Jones, supra,* putting the burden on the employer to show an agreement limiting compensation for accrued but unused leave. Typically, an employee who voluntarily terminates employment will stop work, take all unused (paid) leave, and resign effective the

day after that period of leave has been completed. There is no reason why that same result should not be the norm when an employee is fired, absent a contrary understanding.

**8.** Such a qualification might be, for example, an understanding that accrued leave is payable only in compensated time off; otherwise it is lost. Or it might be that accrued leave, however compensable, can be carried forward into the next year only up to a specified maximum.

**9.** "In allocating the burdens, courts consistently attempt to distinguish between the constituent elements of a promise or a statutory command, which must be proved by the party who relies on the contract or statute, and the matter of exception, which must be proved by his adversary." McCormick on Evidence § 337 at 787 (2d ed. 1972) (footnote omitted). *Cf.* 5 Williston on Contracts § 667(A) at 150–51 (3d ed. 1961) (matters of defense must be pleaded and proved by the insurer to be available as a means for defeating recovery on an insurance policy).

lated by any one plaintiff, *paragraph 8 is otherwise admitted.* [Emphasis added.] [10]

This concession was reflected in the plaintiffs' evidence. Each employee testified at trial that NRA had hired him full-time and had promised, as compensation for his services, a salary plus paid leave.[11] The evidence showed that each increment of leave that an employee accrued but did not use during a particular year was carried forward on his leave record into subsequent years. Each employee's bi-weekly pay stub was imprinted with the number of accumulated, unused leave hours and also contained the admonition, without limitation, "RETAIN THIS STATEMENT—IT IS A RECORD OF YOUR EARNINGS AND DEDUCTIONS."

We conclude that NRA's answer (confirmed by plaintiffs' showing) was sufficient to trigger the *Jones* instruction that NRA, as the employer, must either prove the existence of each employee's agreement to forfeit a portion of his unused leave upon termination, or be held responsible to compensate the discharged employee for all of it.

## III.

NRA asserts that the trial court nonetheless should have granted its directed verdict and post-verdict motions because NRA did prove, without question, that the employees had agreed to a limitation on compensable unused leave. Specifically, NRA points to testimony by six of the seven employees admitting that they each had received an NRA-prepared document announcing a 225-hour limit. Two of the employees, moreover, admitted knowing, prior to 1965, of a then-prevailing 45-day limit on accrued leave. Thus, according to NRA, even if *Jones, supra,* does place the burden on NRA to prove an agreement by the employees to forego accrued but unused leave in excess

of 225 hours (30 days), those employees who continued to work and receive compensation with knowledge of NRA's leave policy must be deemed to have agreed to it. *See Dahl v. Brunswick Corp.,* 277 Md. 471, 476, 356 A.2d 221, 224 (1976); *Borden v. Day,* 197 Okl. 110, 111, 168 P.2d 646, 648 (1946).

■ A. We agree with the general proposition that once an employee learns about a new policy limiting compensation for unused leave upon termination, but elects to stay on the job and accept compensation, that decision is sufficient to imply an agreement to continue working subject to the new limitation. But this general proposition may be limited by the circumstances. In the first place, without the employee's express agreement to be bound by a change in policy, the employer must prove that the employee's knowledge of the change was complete enough for the trier of fact to find, in fairness, that the employee's decision to remain on the job was premised on acceptance of the new policy.

If, for example, the policy change eliminates rights (*e. g.,* the right to compensation for previously accrued leave), the trier may feel the need for more conclusive evidence that the employee accepted the change with eyes open than he or she would in a case where the employer merely imposes prospective restrictions. Second, policy changes affecting conditions of employment will vary in complexity; and, whatever their nature, they will have different impacts on employees depending on individual circumstances. Consequently, the answer to the question whether an employee, upon learning of a policy change, has implicitly agreed to it by remaining on the job cannot be answered without carefully exploring the facts. The trier, for example, must leave room for at least a brief period of time during which the employee may re-

---

10. Consequently, NRA admits that the discharged employees are entitled to compensation for at least a portion of their accrued leave; NRA does not rely on the premise apropos of *Lim, supra,* that the right to payment for, leave is contingent on actually taking time off while still employed.

11. For example, Russell Warye testified that he had been told he would "be able to accrue [vacation time] which was not used." William Davidson testified he "was told that the annual leave would be a form of bonus . . . if I were terminated."

main on the job without prejudice, while pondering his or her personal alternatives. An employee who learns of a policy change on Monday cannot, in fairness, be deemed to have accepted that change merely by reporting to work on Tuesday. On the other hand, the point will come when an employee has stayed on the job too long, with knowledge of the change, to permit a finding that he or she has not accepted the new policy. No bright line test can be developed for this determination. Factors such as the magnitude of vested rights to be surrendered and the employee's assertion of a need for time to make up his or her mind will be relevant here.

■ In summary, the question whether an NRA employee had sufficient knowledge of the 225-hour limit to imply acquiescence in that policy will depend on the trier's evaluation of the totality of the circumstances, including the completeness of the employee's knowledge about the policy and the time reasonably required by that employee to evaluate his or her options. The jury should be so instructed.[12]

B. The employees argue that they were unaware of the 225-hour limit.[13] NRA contends the evidence conclusively demonstrates that they were. This presents a classic jury question. *See Borden, supra* 197 Okl. at 112–13, 168 P.2d at 648–49.

■ In determining whether the trial court should have granted the motions for a directed verdict or for judgment notwith-

---

12. The trial court's instructions outlining the circumstances in which the jury could find an employee's implied agreement to the 225-hour limit did not deal specifically with all the relevant variables we have described. However, because the instructions followed the *Dahl, supra-Borden, supra* approach and were no less favorable to the employer (in fact they were *more favorable than we have prescribed*), we conclude that NRA has no basis for complaint on that ground.

Specifically, following its instruction (quoted in the text above) placing the burden on NRA to show the "agreement to the contrary" defeating the employees' claim, the trial court told the jury:

Agreement to the contrary might be shown by knowledge of an employer's rules or regulations and agreement or acquiescence therein. Custom and usage of a particular employer may form part of the employment contract if known to the employee rather a plaintiff had actual knowledge of the rule in question. In this case the two hundred and twenty-five hour limit on the number of accumulated leave hours for which he could be paid upon termination and with such knowledge, either expressly or by conduct from which an agreement can be implied, agreed to comply therewith are questions to be resolved from the facts and circumstances of each particular case.

If a plaintiff was aware of a memorandum issued by the defendant as to how much unused leave he would be paid for on separation or had reasonable cause to believe such a memorandum existed and continued to work for the defendant and accepts pay for his work he will be bound by the terms of such memorandum as part of his employment contract.

If a plaintiff received a memorandum addressed to all N.R.A. employees and failed to read it or to actually read it he can then be found to have knowledge of the contents as of that date.

If a plaintiff was aware of the defendant's general policy limiting the amount of unused leave an employee would be paid for on termination and he continued to work for the defendant and accepts pay for his work you may use this as evidence that he impliedly agreed to comply therewith depending upon the totality of the facts and circumstances of his particular case.

What a plaintiff thought the notation on his paycheck stub means does not necessarily bind the defendant so as to make what the plaintiff thought a part of his employment contract with the defendant, but it is simply one additional bit of evidence for you to consider.

13. Appellees' trial memorandum states that (1) prior to 1965, NRA employees could accumulate only up to 45 days of leave time, and that all excess hours were dropped from their records; (2) in 1965, this leave policy was changed—in connection with adoption of a new disability plan—to permit unlimited accrual of "'paid leave hours'"; at that time, NRA restored to employee records all excess leave hours that had previously been earned but dropped under the old policy. Appellees concede that NRA "intended the leave policy to be subject to a proviso that no more than 225 hours (30 days) of the unlimited accrued paid leave hours could be paid to an employee upon separation from NRA." They contend, however, "that they are not bound by this limitation on pay for accumulated paid leave hours because NRA did not take adequate measures to inform [them] of its existence."

standing the verdict, we must decide whether a reasonable person, viewing the matter in the light most favorable to the employees, would be unable to reach a verdict in one or more employee's favor. *See, e. g., Calloway v. Central Charge Service,* 142 U.S.App.D.C. 259, 261, 440 F.2d 287, 289 (1971). In contrast, our review of the trial court's denial of the new trial motion, when based on a claim that the verdict is against the weight of the evidence, "is limited to determining whether the trial court has abused its discretion." *Johnson v. Bernard,* D.C.App., 388 A.2d 490, 491 (1978).[14]

In making these evaluations, we note, first, that six of the appellee-employees (other than Joerg) testified they did receive a "stay bonus" memorandum (or learn of its contents) sometime in the summer of 1976.[15] That memorandum dated August 12, 1976, announced NRA's proposed move to Colorado Springs (projected for May 8, 1978), the procedure for identifying employees who would be relocated, and the policy of paying each full-time, permanent employee who did not move (and thus eventually would be dismissed) a monthly incentive bonus beginning August 15, 1976, of 10% of base monthly salary to remain with NRA until the employee's services were no longer required. The last paragraph of the memorandum stated that "[a]n employee's leave accrued up to a maximum of 225 hours will be paid at the time of termination, accrued separately and not part of the Stay Bonus."

■ Three of the employees, however—Ailes, Baggett, and Davidson—testified they believed that the memorandum did not apply to them because they knew they either would be moving to Colorado Springs or otherwise would not be affected by the NRA move because of the nature of their positions (*e. g.,* as a field representative). Two of them testified, moreover, that the

NRA president had confirmed this understanding. Because the 225-hour policy in the last paragraph of the "stay bonus" memorandum was so closely tied to the Colorado move, the jury reasonably could conclude that these three employees justifiably ignored it. Absent any other sure basis for imputing a belief that the limit applied to them, *see* note 12 *supra,* the jury reasonably could find, under all the circumstances, that Ailes, Baggett, and Davidson had not agreed to continue working subject to that 225-hour policy. Nor, on this record, can we find an abuse of trial court discretion in rejecting NRA's claim that the jury verdict for the three employees was against the weight of the evidence. Accordingly, appellees Ailes, Baggett, and Davidson are entitled to compensation for all leave accrued as of their date of discharge, "in the absence of an agreement to the contrary." *Jones, supra* 268 A.2d at 862.

Appellee Joerg testified that he did not receive the "stay bonus" memorandum or otherwise learn about the 225-hour limit. He also testified that, during an earlier tenure with NRA, he had accrued approximately three months of leave prior to terminating NRA employment, and that he believed he had been paid for it in full. On cross-examination, he acknowledged receiving a check which apparently was introduced by NRA to show that, in fact, Joerg had been paid only for 30 days of accrued leave. Counsel, however, did not pursue Joerg's acknowledgement by making clear that the amount of the check was so limited and that Joerg, as a result, must have known about the 225-hour policy. Accordingly, on this record, there is no basis for granting NRA's motions as to Joerg; he is entitled to compensation for accrued leave, as awarded by the jury.

---

14. As we noted in *Johnson, supra* at 491 n.2, "even such narrow appellate review was at one time considered violative of the Seventh Amendment." *See generally* 11 Wright & Miller, *supra,* § 2819 (1973 & Supp.1979).

15. NRA also introduced into evidence memoranda to its employees in 1950, 1952, 1957,

1965, and 1974 explaining or alluding to limitations on compensation for leave. The jury reasonably could have found, however, that aside from Harper and Warye, the appellee-employees did not receive and were not otherwise aware of these memoranda or the policies to which they referred.

■ Appellees Harper and Warye present a different situation. Their employment with NRA began in 1940 and 1949, respectively. They each admitted they continued to work there for many years knowing that there was a 45-day limit on accrued but unused leave. *See* notes 13 & 15 *supra*. Both testified, however, that they learned the 45-day limitation had been lifted—and that previously-lost leave had been restored—in connection with a new disability insurance system adopted in 1965; but both denied learning about the 225-hour limitation that was also part of the 1965 change. *See* note 15 *supra*. Harper and Warye stressed the consistency of this understanding by pointing to the fact that employee payroll stubs showed the restored leave (without notation of any limitation) and by further testifying that they had not received a document announcing any new limitation.[16] Absent proof of their receipt (or awareness) of an NRA document clearly announcing both components of the 1965 change, we cannot say a reasonable jury must have found that Harper and Warye learned about the new, 225-hour limitation simply because they knew the 45-day limitation had been lifted.

Warye and Harper, however, had an additional hurdle, for they admitted receiving the August 12, 1976 "stay bonus" memorandum. Unlike Ailes, Baggett, and Davidson, Warye and Harper did not testify that they had reason to believe this memorandum was inapplicable to them. Nor did they testify about any effort they may have made during the three month period before they were discharged (on November 8, 1976) to preserve their rights to all accumulated leave. For example, they did not inform NRA they were continuing to work without agreeing to the 225-hour limit pending a reasonable period during which to decide whether to resign (keeping all accrued leave) or to remain with NRA (accepting the 10% bonus while surrendering accrued leave in excess of 225 hours). We conclude that Warye and Harper, by receiving the "stay bonus" memorandum and continuing to work at NRA for three months at a 10% bonus, without questioning the 225-hour limit on compensable leave, must be said as a matter of law to have agreed to that limitation.

■ It is true that Harper had been with NRA for approximately 36 years with accrued leave totaling 3,950.25 hours (in excess of the allowable 225), and that Warye's NRA tenure was approximately 27 years with an accumulated 1,947.25 hours of leave (beyond the 225). The jury valued this leave at $40,083.69 and $20,184.77, respectively. However, notwithstanding the potential surrender of substantial value by continuing to work for NRA under the "stay bonus" policy, Harper and Warye pointed to nothing in the record which could justify a finding that, after three months without raising a question, they still had not agreed to all the terms of that policy, including the 225-hour limitation. Conceivably, Harper and Warye anticipated working for the 10% bonus for a long while; the Colorado move, according to the August 12, 1976 memorandum, was "currently estimated as May 1978." In addition, Harper and Warye may have contemplated actually taking their accrued leave, at full pay, while still in NRA's employ. There may have been still other reasons why they agreed to the "stay bonus" terms. Whatever the explanation—and however unfortunate their choice turned out to be—we find no basis for a conclusion that they did not

16. Both admitted receiving an undated NRA Employee Benefits and Procedures Booklet (Harper received it "in the early 70's") which specifically referred to a 225-hour limitation upon payment for accumulated leave upon termination of employment. Harper testified, however, that he interpreted this reference as applying only to "compensatory leave"—an interpretation a reasonable jury readily could have accepted, for the limitation appeared for the first (and only) time under the discussion of Compensatory Leave (which neither Harper nor Warye had accumulated), five pages after the discussion of vacation and sick leave. The booklet stated: "All Compensatory Leave accumulated will be added on to your normal leave accrual and will carry over from year to year. Upon separating from the Association, you will be paid your hourly rate for all leave accumulated up to 225 hours."

make the choice.[17] Accordingly, we must order the trial court to enter judgment for NRA notwithstanding the verdict as to Harper and Warye.[18]

■ Finally, appellee Hines presents a still different case. Sometime during the summer of 1976, NRA fired its Director of Public Affairs; soon thereafter, Hines was appointed Acting Director. Hines found a copy of the "stay bonus" memorandum in the former Director's office and thus became aware of the 225-hour limit on compensation for accrued leave upon termination of employment, at least for those employees subject to that memorandum. Hines' testimony makes clear that he anticipated staying with NRA (hopefully as Director of Public Affairs), and that he did not leave until February 1977, when he resigned after someone else had been appointed as permanent Director. His awareness of the 225-hour limit was enhanced by the controversy over that limit once other employees were discharged in early November 1976.

Under these circumstances, no reasonable juror could conclude that Hines had not accepted the 225-hour limit as a condition of continuing employment. There can be no doubt that Hines knew the 225-hour limit was being generally applied by NRA. In a February 24, 1977 memorandum protesting that limit (there is no earlier protest of record), he acknowledged the "225 hours currently being used as the NRA standard." Moreover, by staying on the job as long as he did after seeing the "stay bonus" memorandum in August 1976 and learning how the 225-hour limit was applied to employees discharged in November 1976, Hines must be deemed as a matter of law to have agreed to risk losing accrued leave in excess

of that limit, in exchange for the prospect of a better NRA job. NRA's argument here is even more compelling than in the cases of Harper and Warye. Accordingly, we must order the trial court to enter judgment notwithstanding the verdict in favor of NRA with respect to Hines' claim.

## IV.

In conclusion, we affirm the trial court's denial of NRA's motion for a directed verdict, judgment notwithstanding the verdict, and a new trial as to appellees Ailes, Baggett, Davidson, and Joerg, and thus confirm the jury awards as to them. However, we reverse and remand for entry of judgment for NRA notwithstanding the verdict as to appellees Harper, Warye, and Hines.

*So ordered.*

HARRIS, Associate Judge, dissenting:

I consider the majority opinion to be sorely flawed in a number of ways, and so respectfully dissent. Since I conclude that an instructional error necessitates reversal and a new trial, my dissent is rather narrowly focused.

## I

Initially, I would briefly refer to the nature of the underlying problem, which seems to me to be somewhat obscured in the majority opinion. Appellant National Rifle Association (NRA) had a policy of permitting its employees to accrue up to a total of 225 hours (30 days) in unused annual leave time, for which they would be compensated upon separation from the association. Beyond that 225-hour total, there was no provision for payment for

17. Harper and Warye did not argue that NRA deceived its employees with the "stay bonus" memo; nor did they contend that NRA created a material term of the "stay bonus" policy, which it later violated, by estimating a move to Colorado in May 1978 but firing them in November 1976. Presumably, if an employee made such an allegation, it would be probative of the question whether an employee can be said to have agreed to give up compensable accrued leave.

18. Whenever a party moves in the alternative for judgment notwithstanding the verdict or for a new trial, the trial court denies both motions, and the appellate court concludes it was error to deny the motion for judgment, the appellate court may: (1) order entry of judgment for the moving party; (2) order a new trial; or (3) remand for the trial court to determine whether there should be a new trial. 9 Wright & Miller, *supra*, § 2540 at 617 (1971).

unused leave time. As noted by the majority, NRA did lay off 80 employees. Of them, six brought suit seeking payment for unused leave time in excess of the 225-hour limitation.[1] By obvious implication, 74 of the discharged employees did not join in such a suit.

Since this dissent is at least temporarily separated from the majority opinion to which it is directed, it is appropriate to quote the relevant portion of the jury instruction which I consider to constitute reversible error:

Leave time is a form of compensation for services and once the services are rendered the right to secure the proposed compensation is vested as much as the right to receive wages or other forms of compensation. Vested means fixed, accrued, settled, and absolute. In the absence of expressed agreement to the contrary plaintiffs have a right to recover the value of the promised compensation. Such agreement to the contrary must be shown by the defendant, National Rifle Association of America. . . .

II

That instruction, in my opinion, was clearly erroneous in that it placed the burden of proof upon the defendant (NRA) to defeat the plaintiffs' contentions as to their alleged entitlements. The majority opinion compounds that error by approving the trial court's giving of the instruction. Since such a result flies in the face of hundreds of years of civil law, I consider the majority opinion to be wholly unsound on this issue.[2]

One of the most fundamental tenets of civil law, consistently reaffirmed, is that the burden of proof never shifts. *See, e. g., Judkins v. Carpenter*, 189 Colo. 95, 97, 537 P.2d 737, 738 (1975) (en banc); *Commercial Credit Corp. v. Harris*, 212 Kan. 310, 312, 510 P.2d 1322, 1325 (1973). "The plaintiff has the burden of proof throughout the case. It must prove by a fair preponderance of the evidence, to the jury's satisfaction, the material allegations of its complaint. The burden of proof does not shift." *Midland Oil and Royalty Co. v. Schuler*, 126 N.W.2d 149, 152 (N.D.1964). The reason why "[l]itigants have a substantial right in having the burden of proof properly placed," *Banks v. Banks*, 8 N.C.App. 69, 70, 173 S.E.2d 631, 632 (1970), is obvious. As one court stated:

When the party having the burden of proof establishes a prima-facie case, he will prevail in the absence of proof to the contrary offered by the defendant. The defendant is not required to meet this prima-facie case by a preponderance of the evidence or by evidence of greater weight. It is sufficient if it equalizes the weight of the plaintiff's evidence. The burden of maintaining the affirmative of the issues involved is upon the plaintiff and remains with him throughout the trial. If upon all the facts the case is left in equipoise, the plaintiff must fail. 20 Am. Jur., Evidence, Sec. 1251. [*Midland Oil and Royalty Co. v. Schuler, supra*, 126 N.W.2d at 153.]

In this case, the trial court instructed the jury that the defendant-employer had the burden of proving an agreement to the contrary of plaintiffs' contention that they were entitled to compensation in lieu of accrued leave time beyond the 225-hour limitation. In fact, under established case law, the burden was on plaintiffs throughout the case to prove an agreement with the defendant in the first place which would en-

---

1. I confess to wonderment at the majority's position that the NRA "conceded" the former employees' *entitlement to the jury instruction* which I consider to be fatally flawed. *See* 821–822. All that the NRA acknowledged was its policy of making financial compensation for unused leave time up to its limit of 225 hours; assuredly the NRA made no concession which went beyond that time limitation.

2. The majority opinion states that the NRA's contention that its employees were entitled to *no compensation beyond the 225-hour limitation* "is in the nature of an affirmative defense that must be pleaded and proved by the defendant-employer." *See* 821. While that assertion unquestionably is an indispensable factor in the majority's rationale, it reflects an unfortunate lack of understanding as to what constitutes an "affirmative defense" for pleading purposes. *See, e. g.,* Super.Ct.Civ.R. 8(c).

title them to compensation in lieu of leave time accrued without limit, since such was their claim. That the trial court misplaced the burden was of critical importance in light of conflicting testimony as to whether the employees had sufficient notice of the restriction on paid leave to make the 225-hour limit an enforceable part of their employment contract. If the jury concluded—as it may well have—that the conflicting testimony was about equally weighted, then it would have been obliged under the trial court's charge to resolve the issue against the party with the burden of proof. In short, the NRA had a right to have the burden of proof properly placed, and it was substantially prejudiced by the instruction which misplaced it.

Any support for shifting the burden of proof which the majority claims to find in *Jones v. District Parking Management Co.*, D.C.App., 268 A.2d 860 (1970), and in the other cases upon which the majority relies is purely illusory. The cases do not stand for the proposition, as the majority asserts (at 820), that "as a general rule, an employee who accrues but does not take vacation or other paid leave is entitled to monetary compensation for that leave upon discharge from employment absent an agreement to the contrary." Rather, what the cases do stand for is that entitlement to pay in lieu of paid leave is wholly a contractual matter. There is an entitlement—if at all—only to the degree that the employer agrees to provide it and the employee, in accepting employment, agrees to the terms.[3] The clear implication of the majority's subtle contortion of the general rule is that, once an employee is allowed to accrue vacation leave rather than take it as it accrues, then that employee is entitled to accumulate leave indefinitely without regard to the reasonable expectations of the employer. Such a conclusion has no basis in logic or in law, nor is it supported by the cases relied upon by the majority.

In *Jones v. District Parking Management Co., supra,* the employee had testified without contradiction that his agreement with his employer provided for a one-week vacation with pay at the end of his first full year of service; that his paid vacations, which at the time of his discharge had increased to four weeks per year, were based on a March to March work year and were always taken the following summer; and that, at the time of his discharge, he had not yet taken any of the four weeks earned during the preceding year of service. 268 A.2d at 861. In other words, the employee in *Jones* claimed entitlement to vacation pay accrued in the year immediately preceding his discharge for cause.[4] Similarly, in each of the cases cited by the majority the employees' claim of entitlement was to leave accumulated in the year of, or immediately preceding, the employees' separation from employment. *See Smith v. Kingsport Press, Inc.,* 366 F.2d 416 (6th Cir. 1966) (vacation benefits for the year to be determined on date employees were on strike); *In re Wil-low Cafeterias,* 111 F.2d 429 (2d Cir. 1940) (one-week vacation earned but not taken as of date employer-company was adjudicated bankrupt); *Harbridge v. Greyhound Lines, Inc.,* 294 F.Supp. 1059 (E.D.Pa. 1969) (three-week vacation earned in year preceding employee's discharge); *Olson v. Rock Island Bank,* 33 Ill.App.3d 914, 339 N.E.2d 39 (1975) (three-week vacation earned in year employee retired); *Berteau v. Wiener Corp.,* 362 So.2d 806 (La.App.

---

3. Some cases make a clear distinction between the right to accumulate vacation time and the right to receive compensation in lieu of vacation if not enjoyed. *See, e. g., Lim v. Motor Supply, Ltd.,* 45 Hawaii 111, 364 P.2d 38 (1961). The distinction is immaterial in this case, since the NRA agrees that its employees have a vested right to pay in lieu of accrued leave upon separation up to the 30-day limit. I simply note that such an entitlement is not automatic, as the majority suggests.

4. I am bewildered by the majority's assertion (at 821) that the NRA's answer to the plaintiffs' complaint "was sufficient to trigger the *Jones* instruction." The *Jones* case was tried without a jury; there is not a hint in this court's opinion (which dealt with a claim for compensation for four weeks of current but unused leave) as to what might be an appropriate instruction in a jury case. (In this case, it appears that the trial judge simply gave an instruction proposed by the plaintiffs.)

1978) (one-week vacation earned in year preceding employee's discharge); *Textile Workers Union v. Paris Fabric Mills*, 18 N.J.Super. 421, 87 A.2d 458, *aff'd*, 22 N.J. Super. 381, 92 A.2d 40 (1952) (collective bargaining agreement terminated by union prior to date on which vacation pay for the year to be determined); *Pfeifer v. A. F. Lowes Lumber Co.*, 206 Or. 115, 291 P.2d 744 (1955) (vacation earned in year in which old collective bargaining agreement expired and new agreement was put into effect); *Valeo v. J. I. Case Co.*, 18 Wis.2d 578, 119 N.W.2d 384 (1963) (vacation pay for the year due under collective bargaining agreement which terminated that year). None of the cases squarely addresses the issue whether the right to accrue leave means the right to accrue leave indefinitely absent an agreement to the contrary, and the majority grasps at straws in order to reach such an absurd result.

To the contrary, it is obvious from the cases cited by the majority that the amount of vacation time to which an employee is entitled is determined by the terms of the employment contract. Entitlement to pay in lieu of vacation time is also a matter of contract. *Marine Inspection Service, Inc. v. Alexander*, 553 S.W.2d 185 (Tex.Civ.App. 1977); *Walters v. Center Electric, Inc.*, 8 Wash.App. 322, 506 P.2d 883 (1973); *Lim v. Motor Supply, Ltd.*, 45 Hawaii 111, 364 P.2d 38 (1961). Moreover, an agreement providing that vacation time may be accrued and an employee compensated at separation for leave time earned but not taken is always subject to conditions or qualifications that are part and parcel of the agreement. *Walters v. Center Electric, Inc., supra; Briggs v. Electric Auto-Lite Co.*, 37 Wis.2d 275, 155 N.W.2d 32 (1967); *Valeo v. J. I. Case Co., supra*. Accordingly, vacation time earned but not taken may only accrue for compensation purposes to the extent permitted under the contract. *Walters v. Center Electric, Inc., supra*.

In this case, the employees asserted that the NRA's allowing them to accrue vacation time over the years created a vested right in them to payment in full for that time. "Since the plaintiffs' rights depend upon the contract, we must examine its terms, not to make it speak where it is silent or contrary to what it says, but to discover what it does say." *Briggs v. Electric Auto-Lite Co., supra*, 37 Wis.2d at 280, 155 N.W.2d at 35. In that regard, the evidence presented by the NRA was that the contract with its employees provided for pay at separation for all accrued annual leave time up to 225 hours (30 days).[5] It was established that that was the policy of the NRA. Whether the notice of that policy was sufficient to bind the NRA's employees to it was a jury question. However, the employees' contention that they were not bound by it—that they were, indeed, entitled to pay in lieu of leave without limit—was a material element of their case. The burden of proof properly started as theirs and remained theirs.

Nor, as noted, does the 225-hour limitation constitute an affirmative defense.[6] By

---

[5]. A company's employee policy directives become contractual obligations when, with knowledge of their existence, employees start or continue to work for the employer. *Dahl v. Brunswick Corp.*, 277 Md. 471, 475, 356 A.2d 221, 224 (1976).

[6]. The "in the absence of express agreement to the contrary" language in *Jones* does not suggest otherwise. *Jones* does not say that absent an agreement to the contrary, an employee allowed to accrue leave may accrue it without limit. Rather, the quoted language, considered—as it properly must be—in its context, refers to the effect of a discharge for cause on the initial agreement. Thus, we concluded in *Jones* that the employer's agreement to allow his employee to take his annual vacation during the summer following the year in which it was earned was not affected by the employee's discharge for cause once the vacation had been earned. Similarly, in each of the cases relied upon the majority, "absent an agreement to the contrary" refers to the effect of a particular event upon the respective employment agreements otherwise providing for the accrual of paid leave. Accordingly, absent an agreement to the contrary, accrued vacation time for the year in question was not affected by discharge, *Harbridge v. Greyhound Lines, Inc., supra; Berteau v. Wiener Corp., supra*, by strike, *Smith v. Kingsport Press, Inc., supra; Textile Workers Union v. Paris Fabric Mills, supra; Valeo v. J. I. Case Co., supra*, by the cessation of business, *In re Wil-low Cafeterias, supra*, by

proving the existence of the limitation policy (including its recognition and acceptance by other employees of the NRA), the NRA met its burden of going forward with the evidence in its attempt to refute the employees' case. In so doing, it properly was attacking the truth of the plaintiffs' allegations and the burden was on the plaintiffs to disprove the existence of the limitation. *See Roberts v. Mitchell Brothers Truck Lines,* 289 Or. 119, 611 P.2d 297 (1980) (a defendant may, under a general denial, offer evidence that refutes a plaintiff's cause of action without being required to raise an affirmative defense); *Morrow v. New Moon Homes, Inc.,* 548 P.2d 279 (Alaska 1976) (in denying the existence of an element of the plaintiff's case, the defendant does not assume the burden of proof); *Wall v. Zeeb,* 153 N.W.2d 779 (N.D.1967) (where defendant's answer denies the allegations in plaintiff's complaint, except as otherwise admitted, qualified, or explained, defendant does not assume burden of proof); *Midland Oil and Royalty Co. v. Schuler, supra* (same). Consequently, the trial court's instruction, insofar as it placed the burden on the defendant to prove its denial of the allegations in plaintiffs' complaint, was clearly erroneous. *Banks v. Banks, supra; Wall v. Zeeb, supra; Midland Oil and Royalty Co. v. Schuler, supra.*

I firmly am of the view that the proper disposition of this case would be to remand it for a new trial with proper instructions to the jury.

### III

I would be remiss if I failed to register not only my disagreement with the majority's disposition of this case, but moreover with the manner in which the majority seeks to impose its wishes upon the public for the future. Appellate courts, after all, are not legislatures. Our responsibility in deciding a case such as this begins and ends with a determination as to whether, based upon the specific factual situation before us, reversible error has or has not been committed. To the extent that our pronouncements in deciding such a case have binding future effect, that effect inexorably is related to the particular facts which have given rise to those pronouncements.

Not content with merely resolving the questions presented, the majority seeks to establish a rule which, if followed literally, would be superimposed upon all employment relationships in this jurisdiction which lack contractual certainty. Thus, the majority opinion states in part (at 821):

> In summary, the rule of this jurisdiction is: (1) the right to accrue paid leave implies the right to compensation for unused leave upon discharge from employment, and (2) once a discharged employee has established the right to accrue leave and the amount of leave unused, the employee is entitled to compensation for it unless the employer sustains the burden of proving "an agreement to the contrary." *Jones, supra,* 268 A.2d at 862.

That statement is flawed in several respects. Initially, I have explained above how *Jones v. District Parking Management Co., supra,* provides no support for any part of the majority's resolution of this appeal. Beyond that, it is axiomatic that the majority may not impinge upon the contractual rights and duties of other employers and employees by in effect "legislating" an employment policy which it deems to be desirable. Additionally, the quoted statement is, of course, dictum. If such a policy were to be considered by a quasi-legislative body, it could be adopted only by affording a right to be heard by all interested parties. Certainly we are not free to adopt such a "rule," which could have an impact on a

retirement, *Olson v. Rock Island Bank, supra,* or by the effective date of a replacement collective bargaining agreement. *Pfeifer v. A. F. Lowes Lumber Co., supra.* None of the cases supports the majority's fanciful theory that absent an agreement to the contrary, an employee may accrue paid leave virtually until doomsday and still take it with him. *Cf. Walters v. Center Electric, Inc., supra* (where there was no evidence to show the total amount of time which an employee might accrue, it was within the trial court's discretion to find that employee's accrual of three and two-thirds weeks' vacation was reasonable).

 

wide variety of employment relationships not now before the court.[7]

This inevitably brings me to the question of what precedential effect the majority opinion may have. I conclude that it has none. The majority of this division of the court has no authority to alter the rule that the burden of proof begins and stays with the plaintiff in an action such as that before us. *M. A. P. v. Ryan*, D.C.App., 285 A.2d 310 (1971). The majority of the division has no authority to fashion a rule purporting to control other employment relationships and practices. Thus, the inescapable conclusion is that while the majority opinion does resolve this case, it disposes of it in a manner which is so patently flawed as to leave it a derelict floating without true future meaning on the jurisprudential sea. While the opinion may well cause problems in future litigation of this type, I am confident that perceptive trial judges will recognize and deal appropriately with both its shortcomings and its precedential limitations.

---

**7.** In a similar vein, the majority's suggestion (slip op. at 18) that the employees could have resigned before becoming bound by the 225-hour limitation, and thereby have become entitled to payment for all accrued and unused leave, is a particularly attenuated type of dictum. (It also strikes me as being contrary to public policy.)